IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JESSE CLUBB,

    Plaintiff,

v.                                         Case No.: 20-CV-01683 - WCG

MARINETTE COUNTY, SHERIFF JERRY SAUVE,
JOHN DOES 1-10, ADVANCED CORRECTIONAL
HEALTHCARE, INC., BRIAN WRUK,
ASHLEY ELAND, DOCTORS 1-10, NURSES 1-10,
WISCONSIN COUNTY MUTUAL INSURANCE
COMPANY, ARAMARK SERVICES, INC.,
ABC INSURANCE COMPANY, DEF INSURANCE
COMPANY, GHI INSURANCE COMPANY, and
JKL INSURANCE COMPANY,

    Defendants.

## PROPOSED FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT

Defendants, Marinette County, Sheriff Jerry Sauve, Brian Wruk, and Wisconsin County Mutual Insurance Company (the "County Defendants"), by their attorneys, Crivello Carlson, S.C., hereby respectfully submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment.

1.     Plaintiff was booked into the Marinette County Jail ("MCJ") on August 25, 2018 on charges for which he was convicted on January 3, 2019. The incident that gives rise to this lawsuit occurred on September 13, 2018. Therefore, Plaintiff was a pretrial detainee during the relevant time period. (Dec. of Majewski, ¶ 5, Ex. A.)

1

2. By the time that Plaintiff was booked into MCJ, he was already missing several of his teeth. He had partial dentures on the top where several teeth had been pulled. On the bottom, he was missing at least eight teeth. (Dec. of Mills, ¶ 2, Ex. F, p. 26-29; ¶ 3, Ex. G.)

3. During Mr. Clubb's 2018 incarceration at MCJ, Marinette County contracted with Aramark Correctional Services to provide all food services to inmates incarcerated at MCJ. (Dec. of Majewski, ¶ 6-7, Ex. B.)

4. The preparation of all food served to MCJ inmates is done either by Aramark employees, or by inmate workers who are overseen by Aramark employees ("kitchen staff"). Neither Marinette County nor any MCJ staff play any role in the preparation of meals for MCJ inmates. (Dec. of Majewski, ¶ 8; *see also* Ex. A; Dec. of Wruk, ¶ 8.)

5. Plaintiff was eating dinner in the dayroom at MCJ on September 13, 2018. (Dec. of Mills, Ex. F, p. 39.)

6. During the dinner mealtime at MCJ, inmates in the general population, such as Mr. Clubb, wait in line to receive a dinner tray. Food has already been portioned onto the dinner trays by kitchen staff. (Dec. of Majewski, ¶ 9; Dec. of Wruk, ¶ 4.)

7. During the dinner mealtime at MCJ, a corrections officer stands behind a door that separates a vestibule with the food cart from the dayroom where inmates eat. That door has a window and a slot so that trays can be passed to and from the kitchen. (Dec. of Majewski, ¶ 10; Dec. of Wruk, ¶ 5; Dec. of Mills, Ex. F, p. 46.)

8. The corrections officer assigned to pass dinner trays stands on the vestibule side of the door and hands a pre-prepared dinner tray to each inmate as they pass by. The

inmate then takes his tray and sits at a table in the dayroom to eat his meal. (Dec. of Majewski, ¶ 11; Dec. of Wruk, ¶ 6.)

9. Plaintiff had waited in line for a dinner tray, which was handed to him by a jail officer. (Dec. of Mills, Ex. F, p. 39-40.)

10. The corrections officer assigned to pass dinner trays does not review or inspect the food on the pre-prepared dinner trays. MCJ staff relies on kitchen staff to review and/or inspect the food prior to it being served to inmates. (Dec. of Majewski, ¶ 12; Dec. of Wruk, ¶ 7.)

11. Upon taking his first bite of food, which happened to be cauliflower and broccoli, Plaintiff bit down on something hard in his food. (Dec. of Mills, Ex. F, p. 40.)

12. Plaintiff had not seen the item on his utensil prior to putting the food into his mouth. (Dec. of Mills, Ex. F, p. 41.)

13. Upon biting down on the item, Plaintiff spit it out onto his tray. (Dec. of Mills, Ex. F, p. 41-42.) It appeared to be a black or brown "hunk of plastic" like the "corner of a cutting board or something." (Ex. F, p. 42.)

14. Plaintiff estimated that the item was about one inch square. (Dec. of Mills, Ex. F, p. 43.)

15. Plaintiff did not see any jail officers in the day room at the time he began eating his food. (Dec. of Mills, Ex. F, p. 45.)

16. Plaintiff believed that a portion of one of his teeth (either tooth number 22 or 23) broke off when he bit down on the object. (Dec. of Mills, Ex. F, p. 43.)

17.     Plaintiff did not spit out that portion of broken tooth but thought he might have swallowed it. About half of the broken tooth was left in his mouth, and one or two other teeth became loose as a result of his biting down on the object. (Dec. of Mills, Ex. F, p. 43-44.)

18.     Plaintiff then took the item that had been in his food and walked over to the door where he had received his tray. (Dec. of Mills, Ex. F, p. 46.)

19.     Corrections Officer Brian Wruk was behind the door passing out and receiving trays. Plaintiff told Officer Wruk, "There was something in my tray." (Dec. of Wruk, ¶ 3, 11; Dec. of Mills, Ex. F, p. 46.)

20.     If an inmate returns a dinner tray complaining that something is wrong with the food, the corrections officer assigned to pass trays should offer the inmate a replacement meal whenever possible. (Dec. of Majewski, ¶ 13; Dec. of Wruk, ¶ 9.)

21.     Officer Wruk could see Mr. Clubb through the window in the door. Plaintiff appeared normal, uninjured, and did not appear to be in any distress. (Dec. of Wruk, ¶ 12.)

22.     Officer Wruk asked Plaintiff if he would like another tray of food. (Dec. of Wruk, ¶ 13; Dec. of Mills, Ex. F, p. 47.)

23.     Plaintiff gave Officer Wruk the piece of plastic, but then he asked if he could have it back as evidence. (Dec. of Wruk, ¶ 11, 14; Dec. of Mills, Ex. F, p. 47.)

24.     Officer Wruk said no, because the item was considered contraband. (Dec. of Mills, Ex. F, p. 46-47; Dec. of Wruk, ¶ 10, 14.)

4

25. Any items that could be used as a weapon and any items that could be used to cut are generally considered to be contraband. This can include pieces of broken items with sharp edges. (Dec. of Majewski, ¶ 14.)

26. MCJ inmates are not allowed to possess such contraband items. When MCJ corrections staff becomes of aware of contraband, they must immediately confiscate them item(s). (Dec. of Majewski, ¶ 14-15, Ex. C.)

27. Plaintiff may have "said something about a dentist" to Officer Wruk at this time, but he could not remember specifics. "I think I said, 'I need to go to the dentist. My teeth is' – or 'My tooth is broke.'" (Dec. of Mills, Ex. F, p. 47; Dec. of Wruk, ¶ 15.)

28. Plaintiff appeared to be speaking normally and Officer Wruk did not see any signs of injury, such as blood or broken teeth. (Dec. of Wruk, ¶ 15.)

29. Officer Wruk advised Plaintiff to complete a medical request slip to see the nurse. (Dec. of Mills, Ex. F, p. 48; Dec. of Wruk, ¶ 19.)

30. During the relevant time period, Marinette County contracted with Advanced Correctional Healthcare ("ACH") to provide all inmate healthcare, and ACH had overall responsibility for medical and health care services at the jail. (Dec. of Majewski, ¶ 21, Ex. E.)

31. During the relevant time period, MCJ had policies in place for inmates to access both emergency and non-emergency healthcare. (Dec. of Majewski, ¶ 19-20, Ex. D.)

32. Later on September 18, 2018, Plaintiff asked Officer Wruk for a medical request slip, and Officer Wruk gave him one. (Dec. of Mills, Ex. F, p. 53.)

33. Once Plaintiff completed the slip, he handed it in to an officer who he thinks was Officer Wruk. (Dec. of Mills, Ex. F, p. 53.)

34. While handing in the slip, Plaintiff asked the officer (who he thinks was Officer Wruk), "Am I going to go to the dentist?" (Dec. of Mills, Ex. F, p. 50, 53, 114.)

35. When an inmate hands in a completed request slip, the officer immediately places it in the nurse request folder. (Dec. of Wruk, ¶ 20.)

36. Medical request slips submitted by MCJ inmates are evaluated by qualified health care professionals employed by ACH and are not evaluated by correctional officers. (Dec. of Majewski, ¶ 26.)

37. All decisions regarding inmate medical treatment and the need for outside healthcare services are made by qualified healthcare professionals employed by the contracted healthcare provider, ACH. (Dec. of Majewski, ¶ 27.)

38. Plaintiff submitted his first medical request slip concerning his teeth on September 13, 2018. (Dec. of Mills, Ex. F, p. 54.)

39. Plaintiff claimed that in the days between September 13, 2018 and September 24, 2018, he filled out four or five other medical request slips about his teeth and handed them in to unidentified jail officers. (Dec. of Mills, Ex. F, p. 54-55.)

40. Neither the jail nor the Health Services Unit ("HSU") has any record of any medical request slip submitted by Plaintiff between September 13, 2018 and September 24, 2018. (Dec. of Majewski, ¶ 16-18.)

41. The slip that prompted Plaintiff's first visit with a nurse in the HSU was undated, so there is no way to confirm when Plaintiff completed or submitted it. (Dec. of Mills, Ex. F, p. 54; Dec. of Mills, Ex. H, p. 5.)

42. Plaintiff saw Nurse Eland in the HSU on September 24, 2018 as a result of this undated request slip. (Dec. of Mills, Ex. H, p. 6.)

43. Neither the Marinette County Sheriff nor the Jail Administrator, placed any restrictions on or regarding ACH's practice of medicine during the relevant time period. (Dec. of Majewski, ¶ 22.)

44. MCJ corrections officers have no involvement in providing inmates with any kind of medical care other than basic first aid or CPR in emergency situations involving potentially life-threatening medical conditions. (Dec. of Majewski, ¶ 23; Dec. of Wruk, ¶ 16.)

45. Qualified healthcare professionals employed by ACH are responsible for ensuring health care services are available for MCJ inmates and for determining what services are needed on a case-by-case basis. (Dec. of Majewski, ¶ 28.)

46. Regarding MCJ inmate healthcare, clinical decisions are the sole province of the qualified health care professionals employed by the contracted healthcare provider, ACH. (Dec. of Majewski, ¶ 29.)

47. As of September 24, 2018, Plaintiff began receiving Tylenol. (Dec. of Mills, Ex. H, p. 26.)

48. MCJ corrections officers do not make any decisions regarding inmate prescription or non-prescription medication. (Dec. of Majewski, ¶ 30.)

7

Case 1:20-cv-01683-WCG   Filed 05/31/22   Page 7 of 15   Document 56

49. On September 27, 2018, Plaintiff submitted another medical request slip that was received by HSU on September 28, 2018. (Dec. of Mills, Ex. H, p. 7.)

50. At that time, the jail physician approved Tylenol for Plaintiff until he could see a dentist. (Dec. of Mills, Ex. H, p. 7, 26.)

51. The nurse completing the September 27, 2018 request slip noted, "jail administration aware of dentistry order." (Dec. of Mills, Ex. H, p. 7.)

52. Corrections officers and jail administrators at MCJ rely on and defer to the medical professionals with whom Marinette County contracts for all inmate-related medical decisions, diagnoses, and treatment. (Dec. of Majewski, ¶ 32.)

53. Whether in response to an inmate's medical request slip or upon being advised of a medical emergency, it is the County's contracted healthcare provider's nursing staff and/or physician who determines what course of medical action is necessary, including whether the inmate should be examined by an outside provider or specialist. (Dec. of Majewski, ¶ 33.)

54. According to their contract with Marinette County, ACH provided dental triage screenings for inmates in accordance with criteria established by a licensed dentist for the purpose of identifying inmates in need of serious dental services. (Dec. of Majewski, ¶ 34.)

55. Pursuant to the contract, when ACH determines that off-site medical or dental services are needed for an inmate, ACH arranges for those services in accordance with the sheriff's policies and procedures. (Dec. of Majewski, ¶ 35.)

56. As it relates specifically to referrals for outside dental care, jail administration has limited involvement. The Jail Administrator plays no role in the diagnostic or decision-making process and has no contact with the inmate deemed to be in need of dental care. (Dec. of Majewski, ¶ 36.)

57. ACH staff in the Health Services Unit ("HSU") advise the jail administration of the need for outside dental care. (Dec. of Majewski, ¶ 37.)

58. Marinette County does not have a standing contract for inmate dental care with any dental providers, so the jail administrator handles each case on a case-by-case basis upon receipt of an order for outside dental care from ACH. (Dec. of Majewski, ¶ 38.)

59. Once the Jail Administrator is notified by ACH staff of the need for outside dental care for a MCJ inmate, either he or someone at his direction makes an appointment with the first willing and available provider in the area. (Dec. of Majewski, ¶ 39.)

60. Once the Jail Administrator receives an order from ACH staff requesting outside dental care for an inmate, either he or someone at his direction immediately begins working on finding a willing and available provider. (Dec. of Majewski, ¶ 40.)

61. Several factors exist that can—and often do—make the scheduling of outside dental appointments for MCJ inmates somewhat difficult. (Dec. of Majewski, ¶ 41.)

62. In a city with a population of only about 10,500 people (and only about 41,500 people in the County), there are a limited number of dentists available in Marinette with whom to book dental appointments. (Dec. of Majewski, ¶ 42.)

9

Case 1:20-cv-01683-WCG    Filed 05/31/22    Page 9 of 15    Document 56

63. All outside health care and dental care for MCJ inmates is billed at the Medicaid rate and paid for by Marinette County. (Dec. of Majewski, ¶ 43.)

64. Some outside medical and dental providers decline to accept inmate patients for financial reasons related to the Medicaid billing rate. (Dec. of Majewski, ¶ 44.)

65. For security reasons, MCJ inmate dental appointments are always scheduled before or after the dentist's regular business hours. (Dec. of Majewski, ¶ 45.)

66. Some Marinette County dentists are simply reluctant to accept inmate patients altogether. (Dec. of Majewski, ¶ 46.)

67. The Medicaid billing rate, timing of inmate appointments, and the very fact that the patients are inmates, taken alone or together, can and often do result in some delay in finding a dentist who will accept the inmate-patient and in finding a time for the appointment. (Dec. of Majewski, ¶ 47.)

68. The jail administration always accepts the first available dental appointment that is offered when they are looking to schedule an appointment for a MCJ inmate—even if it means traveling to another county for treatment. (Dec. of Majewski, ¶ 48.)

69. A narrative progress note dated October 15, 2018 states that Sergeant Lynwood reported that a dental appointment was made for Plaintiff on October 19, 2018 at 7:30 a.m. (Dec. of Mills, Ex. H, p. 9.)

70. Plaintiff was seen by a dentist at Ds. Magnin, Oberdorfer, and Van Laanen on October 19, 2018 at 7:30 a.m. (Dec. of Mills, Ex. H, p. 14.)

71. At Plaintiff's visit at Ds. Magnin, Oberdorfer, and Van Laanen on October 19, 2018, the provider performed an examination and noted that all of Plaintiff's remaining teeth were grossly decayed. (Dec. of Mills, Ex. H, p. 14.)

72. The dentist prescribed an antibiotic "to get infection under control" and recommended alternating ibuprofen and Tylenol as needed for pain. (Dec. of Mills, Ex. H, p. 14.)

73. A follow-up appointment was made at the same dental clinic for October 25, 2018 at 7:30 a.m. for an extraction procedure. (Dec. of Mills, Ex. H, p. 11, 14-15.)

74. Plaintiff was given the antibiotic as prescribed and continued to receive Tylenol as recommended. (Dec. of Mills, Ex. H, p. 26-28.)

75. Plaintiff was then taken to the appointment on October 25, at which time the dentist extracted three teeth. (Dec. of Mills, Ex. H, p. 14.)

76. The dentist recommended over-the-counter ibuprofen and/or Tylenol for pain. (Dec. of Mills, Ex. H, p. 14.)

77. Shortly after returning to MCJ from the dentist on October 25, 2018, Plaintiff completed a medical request slip stating that he was in "extreme pain." (Dec. of Mills, Ex. F, p. 82; Dec. of Mills, Ex. H, p. 19.)

78. Plaintiff also verbally complained to Officer Wruk that it felt like two pieces of his teeth were still embedded in his mouth. (Dec. of Mills, Ex. F, p. 79-80; Dec. of Wruk, ¶ 21-22.)

79. If a MCJ inmate verbally complains to a corrections officer of a non-life-threatening injury, condition, or pain, corrections officers are trained to tell the inmate

11

to complete and turn in a medical request slip so that the nursing staff can determine when and how to evaluate the inmate. (Dec. of Majewski, ¶ 24; Dec. of Wruk, ¶ 17.)

80. MCJ corrections officers are not trained that a broken or cracked tooth constitutes a life-threatening injury. (Dec. of Majewski, ¶ 25; Dec. of Wruk, ¶ 18.)

81. Officer Wruk turned in Mr. Clubb's medical request slip on the morning of October 25, 2018. Officer Wruk also immediately went to the Health Services Unit and verbally notified the jail nurse that Mr. Clubb was complaining that it felt like part of his extracted teeth were still in his mouth and that he was in pain. (Dec. of Wruk, ¶ 23.)

82. Officer Wruk immediately brought this to the attention of the HSU nurse, who then examined Plaintiff that same morning at 10:30 a.m. (Dec. of Mills, Ex. H, p. 18.)

83. Officer Wruk verbally relayed Mr. Clubb's complaint to the jail nurse because Mr. Clubb said he was in pain and Officer Wruk knew that Plaintiff had just returned from an appointment with an outside provider in which a procedure had been performed on his teeth. Officer Wruk wanted to make sure that the nurse knew about Mr. Clubb's complaint right away in case something had gone wrong during the procedure. (Dec. of Wruk, ¶ 24.)

84. The nurse called the dentist and was told that sometimes fragments of extracted teeth can remain in the socket. The nurse was told that the fragments may dislodge on their own. If Plaintiff was still complaining of these symptoms after a week, he should return to the dentist. (Dec. of Mills, Ex. H, p. 18.)

85.     Plaintiff submitted a grievance about this response to his medical request, and the nurse reiterated to him what the dentist had told her. (Dec. of Mills, Ex. F, p. 81; Dec. of Mills, Ex. H, p. 20.)

86.     She further noted that if the fragment was still intact after a week, Plaintiff could return to the dentist. (Dec. of Mills, Ex. H, p. 20.)

87.     Four days later, on October 29, 2018, Plaintiff submitted another medical request slip regarding his teeth. He stated, "pieces of teeth still in the area that was pulled. causing extream [sic] pain still." (Dec. of Mills, Ex. H, p. 21.)

88.     The HSU nurse received the request the following day, October 30, and called the dentist, who set another appointment for Plaintiff to be evaluated at 7:30 a.m. on October 31, 2018. (Dec. of Mills, Ex. H, p. 21.)

89.     Plaintiff was transported to the dentist on October 31, 2019 at 7:30 a.m. (Dec. of Mills, Ex. H, p. 22-23.)

90.     The dentist noted bone spurs and diagnosed Plaintiff with dry sockets and a post-extraction infection. Bone spicules were removed and Plaintiff was prescribed another antibiotic. (Dec. of Mills, Ex. H, p. 23.)

91.     Plaintiff confirmed that he received that antibiotic as well as Tylenol in the week following this second procedure. (Dec. of Mills, Ex. F, p. 89.)

92.     The September 18, 2018 conversation about Plaintiff's broken tooth and the October 25, 2018 conversation about Plaintiff's extraction procedure and resulting pain were the only conversations Officer Wruk had with Mr. Clubb about his teeth or any dental issues. (Dec. of Wruk, ¶ 25; Dec. of Mills, Ex. F, pp. 47-48, 50, 53, 80, 82, 114 121.)

93. Officer Wruk played no role in scheduling any appointments with outside dental providers for Mr. Clubb. (Dec. of Wruk, ¶ 26.)

94. MCJ inmates are informed of the process through which they may request to be seen by a healthcare professional when they are booked into the jail. (Dec. of Majewski, ¶ 16.)

95. The process is also explained in the inmate rules handbook, copies of which are posted throughout the jail for inmates' reference. A copy is also given to each inmate. (Dec. of Majewski, ¶ 17.)

96. Inmates, including Plaintiff, are informed that they should complete a non-emergency health care request form ("medical request slip") and hand it in to any corrections officer. (Dec. of Majewski, Ex. C, p. 12.)

97. Correctional staff is not allowed to provide an inmate with any type of medication for any reason without prior approval from the jail's physician, nurse practitioner, or other prescribing provider. (Dec. of Majewski, ¶ 30-31.)

98. Officer Wruk had completed all training required by the Wisconsin Law Enforcement Standards Board as of September 13, 2018. (Dec. of Majewski, ¶ 50.)

99. Plaintiff never communicated with MCJ's Jail Administrator or Assistant Jail Administrator about the timing or sufficiency of his dental care. (Dec. of Mills, Ex. F, p. 120-121.)

100. At most, Plaintiff testified that he was aware of other inmates generally discussing their complaints about dental care. He was not aware of anyone specific

submitting requests for dental care and being unhappy with the timing of care or being unhappy with the care they received. (Dec. of Mills, Ex. F, p. 115-116.)

101. When Plaintiff made his next appointment for dental care in 2020 after being released from jail, "it took some time" to get in to see the dentist. (Dec. of Mills, Ex. F, p. 98.)

102. In Robert Majewski's more than 17 years of experience as the Jail Administrator for Marinette County Jail, the average wait time for an inmate to get in for an appointment with an outside dental provider is about three weeks. (Dec. of Majewski, ¶ 49.)

Dated this 31st day of May, 2022.

By:   s/ Sara C. Mills
SAMUEL C. HALL JR.
State Bar No: 1045476
SARA C. MILLS
State Bar No. 1029470
Attorney for Defendants Marinette County, Sheriff Jerry Sauve, Brian Wruk, and Wisconsin County Mutual Insurance Company
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Ph: (414) 271-7722
Fax: (414) 271-4438
E-mail: shall@crivellocarlson.com
      smills@crivellocarlson.com